**NAVIGATOR GROUP FUNDS, Eileen Kirkwood, Paul Singer, Maria Saumberger and Livingston H. Domas, Plaintiffs,**

v.

**SHEARSON HAYDEN STONE INC., Joseph Szoecs and Joel Margolies, Defendants.**

No. 77 Civ. 5350 (VLB).

United States District Court,
S. D. New York.

March 20, 1980.

John C. Klotz, New York City, for plaintiffs.

Willkie, Farr & Gallagher, New York City, for defendants.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I.

The amended complaint in this action ("complaint") charges violations of the Commodity Exchange Act of 1936 as amended by the Commodity Futures Trading Commission Act of 1974 (collectively "the commodities acts"), 7 U.S.C. § 1 *et seq.* It also purports to charge violations of the securities acts, and charges violations of fiduciary obligations under the laws of New York State.

The plaintiffs are Navigator Group Funds ("Navigator"), a limited partnership engaged in pooled commodities investment, and four of its limited partners. Defendants are Shearson Hayden Stone Inc. ("Shearson"), a corporation with principal place of business in New York, and Joel Margolies and Joseph I. Szoecs, two employees of Shearson.

Defendants have moved to dismiss the complaint. For the reasons which follow, the motion is denied as to the claims on behalf of Navigator; it is granted on the basis set forth in Section IV, *infra,* with respect to the securities claims on behalf of Navigator's limited partners.[1]

### II.

The factual allegations of the complaint are accepted as true for purposes of considering defendants' motions. The facts as distilled from the complaint follow.

In 1976 Shearson "embarked on a course of conduct designed to increase its corporate profits" by generating large amounts of commission income "through the purchase and sale of investments in commodity futures contracts." Thus it encouraged the

---

1. The defendants have moved to dismiss the first and third counts of the complaint on the grounds that these claims, brought in the name of Navigator Group Funds, a limited partnership, constitute a derivative action by the limited partners. Under New York law, the complaint in a limited partners' derivative suit must allege demand on and refusal by the general partners to institute the suit. N.Y.Part. Law § 115–a. There is no such allegation in this complaint.

Section 115–a applies only to limited partners' derivative suits. On its face the complaint, to the extent that it alleges claims in the name of the partnership, appears to have been brought by the partnership itself, not by the limited partners suing derivatively. Section 1025 of the CPLR authorizes such suits in the partnership name.

The defendants have not offered any evidence that Navigator's general partner failed to authorize this suit. The joinder of some of the limited partners as plaintiffs does not establish that they alone have authorized and directed the entire law suit. Whatever other disabilities affect their claims (see Section IV, *infra*), their claims are distinct from those of the partnership, although they apparently arise out of the same series of events. Nor have the defendants cited any authority for the proposition that proper authorization for the bringing of the action by the partnership must be alleged in the complaint. Accordingly, I deny the motion to dismiss the claims against Navigator on this ground without prejudice to renewal if the defendants produce evidence that the suit was not properly brought on behalf of the partnership.

establishment of pooled investment accounts with Shearson.

To induce Navigator to open a limited discretionary account at Shearson, Shearson and its employees made various misrepresentations. Thus they represented that at least 40% of Navigator's account would be kept in reserve at all times, that no more than 20% of the account would be committed to a single investment position, and that the Navigator account would be reviewed daily by a Shearson officer. On July 7, 1976 Navigator opened a pooled account for investment in commodities with Shearson, and Szoecs began to function as broker for Navigator under the supervision of Margolies. With the full knowledge, consent, advice and encouragement of Shearson, monies were solicited from Navigator's limited partners to be invested in the pooled account maintained by Navigator at Shearson. In or about April, 1977 Shearson held for the account of Navigator the sum of $404,000, and it accepted an additional $95,-000 capital investment in the pool in or about May, 1977.

Defendants failed to hold the stated percentages of Navigator's account in reserve; they invested an excessive percentage of the account in single commodity contracts; they failed to place stop orders on futures contracts; and they refused to follow Navigator's specific directions as to investments in commodity futures. $464,000 of the total of $499,000 invested through Navigator in the account at Shearson was dissipated and lost.

## III.

*Commodities Acts Claim*

[1] The first count of the complaint alleges, on behalf of Navigator, violations by the defendants of the antifraud provisions of the commodities acts applicable to members of contract markets, 7 U.S.C. § 6b.[2] The gist of the first cause of action is that Shearson and its employees induced Navigator to open a limited discretionary account at Shearson by various misrepresentations. The defendants' motion to dismiss the first count is predicated on the ground that there is no implied private right of action under the commodities acts. On the basis of the analysis which follows, I hold that there is such a right of action.

Analysis of this issue must begin with the Supreme Court decisions in *Touche Ross v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), and *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979).[3]

---

**2.** While the complaint does not specify, the plaintiffs' memorandum indicates that the action is brought for violation of § 4b of the Act, 7 U.S.C. § 6b, which is the only anti-fraud provision applicable to members of contract markets:

It shall be unlawful for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of (1) any contract of sale of any commodity in interstate commerce, or (2) any contract of sale of any commodity for future delivery made, or to be made, on or subject to the rules of any contract market for or on behalf of any person if such contract for future delivery is or may be used for (a) hedging any transaction in interstate commerce in such commodity or the products or by-products thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof—

(A) to cheat or defraud or attempt to cheat or defraud such person;

(B) willfully to make or cause to be made to such person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;

(C) willfully to deceive or attempt to deceive such person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person; or

\* \* \* \* \* \*

**3.** In a decision dated August 24, 1978, I denied the defendants' motion to dismiss an earlier complaint on the same grounds. That decision relied to some extent on the reasoning of *Goodman v. Hentz,* 265 F.Supp. 440 (N.D.Ill.1967). The reasoning of that case—and, indeed, that of a substantial number of cases decided before last year—has been cast in doubt by the Supreme Court's recent decisions. I therefore

The goal of the analysis, according to these cases, is to determine what Congress actually intended.

█ In determining intent, the court may look to two sources: the language of the statute and the legislative history. If those sources indicate an intent not to create a right of action, the court's inquiry is at an end. Other factors for the court's consideration, enumerated in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975),[4] need not be reached if the language of the statute and its history clearly indicate that creation of a private right of action was not intended.

The statute itself does not explicitly provide for a private right of action for violation of its antifraud (or any other) provisions, nor does it explicitly confer jurisdiction on the courts over private actions brought under it. It does provide a number of other remedies for violation of the commodities acts, including a reparations procedure to be administered by the Commodities Futures Trading Commission ("CFTC") and open to any injured investor, 7 U.S.C. § 18; disciplinary proceedings to be conducted by the CFTC with respect to members of commodities exchanges found violating the Act, 7 U.S.C. § 12c; authority in the CFTC to sue in federal court for injunctions against unlawful commodities futures practices, 7 U.S.C. § 13a–1; and authority in the CFTC to issue cease and desist orders, 7 U.S.C. § 13b. It also provides criminal penalties for knowing violation of various sections of the commodities acts, 7 U.S.C. § 13.

If the statute itself were the only source, the availability of these remedies would, under *Transamerica,* be dispositive of the question of legislative intent. In *Transamerica* the Court refused to imply a private right of action for violation of the anti-fraud section of the Investment Advisers Act, suggesting that the postulation of specific remedies by Congress inhibited the implication of others:

Unlike § 215, § 206 simply proscribes certain conduct, and does not in terms create or alter any civil liabilities. If monetary liability to a private plaintiff is to be found, it [sic—the court?] must read it into the Act. Yet it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it. When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode. [citations omitted] Congress expressly provided both judicial and administrative means for enforcing compliance with § 206. First, under § 217 willful violations of the Act are criminal offenses, punishable by fine or imprisonment, or both. Second, § 209 authorizes the Commission to bring civil actions in federal courts to enjoin compliance with the Act, including, of course, § 206. Third, the Commission is authorized by § 203 to impose various administrative sanctions on persons who violate the Act, including § 206. In view of these express provisions for enforcing the duties imposed by § 206, it is highly improbable that "Congress absentmindedly forgot to mention an intended private action." *Cannon v. University of Chicago,* 441 U.S. [677] at 742, [99 S.Ct. 1946 at 1981, 60 L.Ed.2d 560] (Powell, J., dissenting).

find it necessary to take a new look at the issue in light of those decisions. The 1978 amendments to the commodities acts, passed very shortly after my August decision, also prompt a fresh consideration.

4. Those factors are:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," [emphasis in original; citation omitted] that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or im-

plicit, either to create such a remedy or to deny one? [citation omitted] Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? [citations omitted] And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? [citations omitted]. *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975).

*Id.* 444 at 20, 100 S.Ct. at 247.

The anti-fraud provisions of the commodities acts are similar to those contained in the Investment Advisers Act at issue in *Transamerica,* and the commodities acts contain counterparts to various of the remedies available under the Investment Advisers Act.

The administrative reparations procedure which is available to injured investors under the commodities acts has no counterpart under the Investment Advisers Act. So far as the individual investor is concerned, this procedure is a more adequate substitute for a private right of action than those remedies which in *Transamerica* were found to negate any legislative intent to permit the implication of a private right of action; unlike the remedies in the Investment Advisers Act it serves not only to deter the conduct prohibited, but it also provides the injured investor with a means of being compensated for his loss.[5]

The inquiry under *Transamerica,* however, does not end here. "Even settled rules of statutory construction could yield, of course, to persuasive evidence of a contrary legislative intent." *Id.* at 20, 100 S.Ct. at 247. Accordingly, examination of the legislative history of the commodities acts is indicated, to determine whether it yields "persuasive evidence" of contrary legislative intent.

While the original Commodity Exchange Act ("CEA") was enacted in 1936, the regulatory scheme as it exists today is a product of the 1974 amendments. Those amendments, passed as the Commodities Futures

Trading Commission Act ("CFTCA"), vested in an independent commission, the CFTC, "exclusive" jurisdiction over the trading of commodities futures. It is therefore the legislative history of the 1974 amendments which is relevant to the instant inquiry.[6]

Prior to 1974, a number of courts had implied a private right of action under various provisions of the CEA, including its antifraud provisions, *e. g. Deaktor v. L.D. Schreiber & Co.,* 479 F.2d 529 (7th Cir.), *rev'd on other grounds sub nom. Chicago Mercantile Exchange v. Deaktor,* 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973); *Goodman v. H. Hentz & Co.,* 265 F.Supp. 440 (N.D.Ill.1967); *Booth v. Peavey Co. Commod. Services,* 430 F.2d 132 (8th Cir. 1970); *Johnson v. Arthur, Espey, Shearson, Hammill & Co.,* 341 F.Supp. 764 (S.D.N.Y. 1972). The legislative history of the CFTCA indicates that Congress was aware of these cases at the time that it passed the 1974 amendments, *e. g.,* 120 Cong.Rec. 4133, 92nd Cong., 1st Session, Remarks of Rep. Poage (Chairman of House Committee on Agriculture); Hearings on H.R.11955, House Committee on Agriculture, 93d Cong., 2d Session ("House Hearings—1974"), 249, 32; Hearings on S.2485, S.2578, S.2837, H.R.13113, Senate Committee on Agriculture and Forestry, 93d Cong., 2d Session ("Senate Hearings—1974"), Pt. 3 at 737, 746.

In determining what if any conclusions can be drawn from that knowledge, the Supreme Court's decision in *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), provides some

---

5. The defendants have also relied on the statute's grant (7 U.S.C. § 2) of "exclusive jurisdiction" over commodities trading to the CFTC. The legislative history, however, indicates that this provision was primarily designed to insure that there would be no interference by other government agencies in the area committed to the plenary control of the CFTC. Conf.Rep. No. 93–1383, 93d Cong., 2d Sess. at 23. Indeed, Congress explicitly provided that:

Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State. 7 U.S.C. § 2. While the legislative history reveals that Congress was particularly concerned, when it

drafted that proviso, that there be no interference with the jurisdiction of the courts over antitrust and ordinary commercial cases, Hearings on S.2485, S.2578, S.2837, and H.R.13113, Senate Committee on Agriculture and Forestry, 93d Cong., 2d Sess. ("Senate Hearings—1974"), Pt. 3 at 663–664, its presence renders the impact on the federal courts of the "exclusive jurisdiction" language ambiguous at best.

6. The CEA contained an antifraud provision which was not substantially changed in 1974. The statutory scheme in the context of which the provision appears, however, was radically changed in 1974.

guidance. In *Cannon,* the Court implied a right of action under Title IX of the Education Act Amendments of 1972 in spite of the statute's silence on that issue and its explicit provision of another remedy for violation of the Act. The Court regarded it as significant that Title IX was patterned on Title VI of the Civil Rights Act of 1964, under which one circuit court and a number of district courts had implied private rights of action. From this the Court reasoned that Congress, presumably aware of case law developments, intended that Title IX share the same judicial gloss. The Court found it possible to draw this inference only because in 1972, when Title IX was passed, Congress knew it could count on the courts to imply statutory rights of action quite liberally.

The reasoning of *Cannon* is complementary to, rather than inconsistent with, that of *Touche Ross,* decided only one month later, and *Transamerica,* decided only six months later. All three indicate that search should be made for the actual intent of Congress. *Cannon* recognizes that the inquiry into legislative intent requires, at least with respect to legislation passed during a more permissive era of judicial implication of private rights of action, consideration of congressional awareness of and response to judicial developments. *Touche Ross* and *Transamerica* were concerned with statutes enacted before the era of liberal implication of private rights of action, and thus the likelihood of congressional awareness of this judicial liberality did not have to be factored into the analyses in those cases.

This case presents what is in many ways a more appropriate context for the *Cannon* reasoning than did *Cannon* itself. Here it

is not necessary to look to a different statute for a background of court-implied remedies; private rights of action had been implied with respect to the CEA itself, which the 1974 legislation amended and revamped. Nor is it necessary to impute knowledge of the case law to the legislators who enacted the CFTCA; the legislative history contains ample evidence that they possessed that knowledge. As in 1972 when Title IX was passed, Congress in 1974 had every reason to believe that its omission expressly to provide for private rights of action would not preclude the courts from implying them. The judicial trend toward a more restrictive approach to implied private rights of action was not established until the Supreme Court issued a series of decisions in 1974 and 1975, *e. g. National Railroad Passenger Corp. v. National Assoc. of R.R. Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974); *Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975); *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).[7] Congress in early 1974 cannot be expected to have read the handwriting on the wall.[8] I find it consistent with the legislative history to imply a private right of action for violation of the antifraud provisions of the commodities acts.

To whatever extent it has significance, the legislative history of the 1978 amendments to the commodities acts supports this conclusion. "While subsequent legislation can disclose little or nothing of the intent of Congress in enacting earlier laws," *Transamerica supra,* at n. 13, the interpretation placed on the earlier legislation by congressmen amending it only four years later is surely entitled to some weight.

---

**7.** Defendants do not seriously dispute that the restrictive trend was not well established, if at all, in 1974. They cite no cases earlier than these as evidence of that trend.

**8.** The Senate Agriculture and Forestry Committee was warned by one witness that the suggested reparations procedure might be construed by the courts to preclude the right of recourse to the courts. Senate Hearings—1974, Pt. 3; 737. He suggested that Congress amend the bill to make it clear that the repara-

tions procedure was only an alternative remedy. Without any indication of the credence or importance accorded to this testimony, it can hardly be regarded as evidence that Congress was on notice of the construction that might be given this new provision. In addition, it is quite possible that the Committee assumed that by adding the proviso quoted above at fn. 5, it was taking care of this potential problem as well as of the problems of jurisdiction over ordinary commercial and antitrust litigation.

Two items in the legislative history of the 1978 amendments are worthy of note. One is the description of the administrative reparations procedure as an alternative forum for customer claims; the other is a rationale offered for exempting contract markets from law suits by states.

Senator Huddleston, a member of the Senate committee responsible for the amendments, described the administrative reparations procedure as follows:

> In 1974, Congress directed the Commission to establish a reparation procedure for adjudicating customer complaints against commodity professionals and firms inexpensively and quickly. During the past 3 years, an unexpected number of reparation cases have been filed with the Commission, resulting in a substantial backlog in the processing of these customer claims. Compounding the undue stress placed on the reparation program, certain Federal district courts have taken the unfortunate position that Congress intended reparations to be the exclusive forum for adjudicating commodity customer claims. ·[citations omitted] In order to alleviate the burden on the Commission's reparation program, the committee adopted an amendment that provides—for reparation complaints where the amount claimed as damages does not exceed $5,000—that a hearing be held only on the novel or basic issues that are determinative of the case. Thus, an aggrieved commodity customer will be able to obtain more expeditious treatment of his claim should the customer elect to pursue a claim in reparations rather than proceed to arbitration or pursue in court

the private right of action which has been judicially implied for violations of certain provisions of the Commodity Exchange Act, or which in the future courts may recognize for other provisions of the act.

124 Cong.Rec. 10537, 95th Cong., 2d Sess. (1978) (Remarks of Sen. Huddleston).

Senator Huddleston's remarks strongly suggest that the reparations procedure was designed to provide an attractive alternative to, rather than a replacement for, litigation.[9] They also suggest that even as late as 1978, Congress was still inclined to let the courts decide which statutory provisions would give rise to an implied private right of action, even though the courts were showing an increasing reluctance to shoulder that burden.

One of the changes effected by the 1978 amendments was the addition of a statutory cause of action by a state as "parens patriae" for injunctive relief and damages. The provision specifically exempts suits against contract markets from its coverage. Senator Leahy of the Senate Committee responsible for the bill, the Committee on Forestry and Agriculture, explained that a part of the justification for exempting contract markets from law suits by states was the subsisting deterrent effect upon such contract markets of implied private rights of action that might be invoked against them:

> The exemption from State suits provided to contract markets is justified due to the deterrent effect on contract markets caused by Commission regulation, institution of Commission enforcement proceed-

---

**9.** The Conference Report indicates that the reparations procedure was intended to provide a faster, less expensive alternative to litigation.

In an attempt to bring about inexpensive and expeditious adjudication of customer claims, Congress authorized the creation of two extra-judicial forums for resolution of customer complaints. First, each contract market was required to provide a fair and equitable procedure for the voluntary settlement by arbitration or otherwise of customers' claims and grievances not in excess of $15,000. Second, the Commission was directed to establish a reparations procedure for adjudicating cus-

tomer complaints brought against commodity professionals and firms. Additional customer protection was contemplated by the provisions of the 1974 amendments that (1) authorized the Commission to determine whether and on what terms dual trading practices of floor brokers and futures commission merchants should be permitted, and (2) broadly proscribed fraudulent and deceptive practices by commodity trading advisors and pool operators.

1978 U.S.Code Cong. & Admin.News, pp. 2087, 2099.

ings, and the implied private rights of action that may be brought against those contract markets that fail to discharge their duties under the Commodity Exchange Act. In those actions brought by a State under this bill, a customer who makes an informed, voluntary election to have his State sue on his behalf to recover monetary damages for a particular violation would thereby extinguish that person's other alternatives for redress: arbitration, reparations, or judicially implied private rights of civil action under the Act.

124 Cong.Rec. 10527, 95th Cong., 2d Sess (1978), Remarks of Sen. Leahy.

In light of Congress' express reliance on judicially implied private rights of action in fashioning an exemption from one of its enforcement provisions, failure to fulfill that expectation could distort the intended regulatory scheme.

Defendants have pointed to other aspects of the legislative history which, they suggest, indicate that Congress did not intend that a private right of action be implied. Thus they note that prior to the passage of the 1974 Act, three bills were introduced and died in committee which would expressly have provided for private rights of action. With regard to these bills, I find persuasive the reasoning of the court in ·*Smith v. Groover,* 468 F.Supp. 105, 113 (N.D.Ill.1979):

> The bills to which defendants refer all provided for the recovery of treble damages, a remedy previously unavailable to plaintiffs suing on an implied right of action. The defeat of these bills, therefore, demonstrates nothing more than a congressional decision not to expand recovery under the existing private right.

Nor is it useful to speculate on the significance of bills which were never debated on the floor of Congress or made the subject of committee reports.

Defendants also note the failure of the Senate Report on the 1978 Amendments to catalog private rights of action among the protections and remedies provided under the commodities acts:

> The Commodity Exchange Act provides many customer protections and remedies. The Act directs the Commission to promulgate and administer a regulatory program that includes registration of commodity professionals, segregation of customers' funds by futures commission merchants, establishment of dual trading guidelines, creation of a procedure for the adjudication of reparation claims, monitoring exchange arbitration procedures and disciplinary actions, and licensing of industry self-regulatory futures associations. Moreover, customers are afforded protection through the Commission's power to sue directly for injunctive relief and to invoke a full range of administrative remedies where appropriate to curb unlawful behavior.
>
> The Commodity Futures Trading Commission was created in order to assure that a single expert agency would have the responsibility for developing a coherent regulatory program encompassing futures trading and related activities. Therefore, Congress has vested in the Commission exclusive jurisdiction to build upon the foundation provided by the Commodity Exchange Act in erecting a sound and strong Federal regulatory policy governing futures trading.

S.Rep. No. 95–850, 95th Cong., 2d Sess. (1978), *reprinted in* [1978] U.S.Code Cong. & Admin.News, pp. 2087, 2100–2101.

The defendants contend that had Congress intended to allow a private right of action, it would have listed that remedy along with all the others.

Nothing in the quoted portion suggests that Congress intended to preclude the courts from implying remedies. The Senate Report simply describes those remedies which are to be specifically provided by the commodities acts. Other aspects of the 1978 legislative history, explicated above, indicate that Congress intended to rely on the courts to "provide" certain judicial remedies.

Defendants further contend that since Congress amended the commodities acts in 1978, its failure explicitly to provide for private rights of action is a clear reflection of their intent to preclude such rights. In support of that contention they note that Congress was aware in 1978 that certain courts had declined to imply private rights of action in the wake of the 1974 amendments, see Remarks of Senator Huddleston, quoted supra at 11–12, and they assert that by 1978 the trend toward a more restrictive judicial approach to such implied private rights had become quite clear.[10]

Had Congress set out in 1978 to rewrite the law of commodities futures regulation as thoroughly as it did in 1974, the defendants' argument would be more persuasive. While the 1978 amendments made some substantial changes in and additions to the commodities acts, they did not alter the fundamental regulatory framework. The logic of defendants' argument would be to require federal courts to prohibit private actions with respect to any statute amended in any way after the mid-1970's, if Congress did not explicitly create a private right of action. There is no support in the recent Supreme Court decisions for such a requirement. Absent some indication that Congress' attention was focused on the need to overrule the district court decisions disapprovingly cited by Senator Huddleston, I decline to conclude that the failure to enact legislation overruling those decisions constituted an implied endorsement of their holdings.

Since the legislative history supports the implication of a private right of action, the analysis may proceed to the other, now less important factors enumerated by Cort v. Ash, 422 U.S. at 78, 95 S.Ct. at 2088: [11]

1) is "the plaintiff 'one of the class for whose especial benefit the statute was enacted'?" (emphasis in original).

2) "is it consistent with the underlying purpose of the legislative scheme to imply such a remedy for the plaintiff"?

3) "is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law"? [12]

1) *Class to be benefitted by statute.* The commodities acts were certainly designed to protect investors in commodities futures, among others. The congressional reports on the bill which became the CFTCA cite fraudulent treatment of customer accounts as among the many evils which prompted the amendments, e. g. H.Rep. No. 93–975, 93d Cong., 2d Sess., 34, 38.

2) *Consistency with statutory scheme.* Defendants urge that implying a remedy in this case would be inconsistent with the statutory scheme. They contend that by vesting plenary jurisdiction in the CFTC and providing a detailed scheme of administrative relief, Congress created a completely

---

**10.** The defendants also suggest that Congress could have responded to the backlog of reparations claims described by Senator Huddleston in one of two ways: by streamlining the reparations procedure or by expressly conferring jurisdiction on the courts. By taking the former course, they suggest, Congress implicitly rejected the latter.

It is not at all clear, however, that the provisions in the 1978 legislation, with respect to reparations procedures, shed any light on Congress' attitude towards judicially implied rights. Given the enormous backlog, those provisions would probably have been necessary regardless of the availability of a judicial forum; Senator Huddleston's comments suggest that the refusal of a few district courts to imply private rights of action had only somewhat aggravated a pre-existing condition. It could just as easily

be surmised that Congress undertook to streamline the procedures in order to preserve their character as an attractive alternative to litigation.

**11.** See fn. 4, supra.

**12.** Touche Ross and Transamerica hold that these factors need not be considered if the statute and its history clearly reveal a negative intent. Presumably, they would also be irrelevant if Congress had quite clearly expressed a positive intent—by, for example, providing for attorney's fees, or by so stating in a committee report. In cases like this one, however, where intent must be established by inference from the legislative history, it probably remains appropriate to examine the additional Cort factors.

comprehensive regulatory structure, the purpose of which would be controverted by allowing injured customers access to the courts.

The CFTC itself does not agree; its position is that providing such access for injured customers is entirely appropriate. Statement of the CFTC Concerning Referral of Private Litigation under the Doctrine of Primary Jurisdiction, 41 Fed.Reg. 18471 (May 5, 1976). I agree with the defendants that the CFTC's position is not entitled to any particular deference on the issue of legislative intent. It is, however, entitled to considerable deference on the issue of consistency with the legislative scheme as the opinion of the regulatory body to whom enforcement under the scheme is entrusted. The legislative history of the 1978 amendments reveals Congress' concern with the backlog of reparation cases burdening the CFTC, and its concomitant eagerness to provide additional enforcement by streamlining the reparations procedure and by creating causes of action on behalf of the states. *See* 24 Cong.Rec. 10537, 93d Cong., 1st Sess. (1978) (Remarks of Sen. Huddleston); S.Rep. No. 95–850, 93d Cong., 1st Sess. (1978), 26. Both the CFTC and Congress appear to have recognized that the more enforcement assistance is provided from other quarters, the more effectively the regulatory provisions of the commodities acts will be carried out.

3) *Appropriateness of implying cause of action based on federal law.* While fraudulent conduct by commodities brokers might give rise to state tort liability, commodities futures activity impacts upon national markets. It is, and historically has been, an area of primary federal concern. *Smith v. Groover*, 468 F.Supp. 105, 115 (N.D.Ill. 1979).[13]

IV.

*Securities Acts Claims*

The second count of the complaint is apparently intended to allege, on behalf of the individual limited partners, violations of the registration provisions of the Securities Act of 1933, 15 U.S.C. §§ 77e, and violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* The defendants move to dismiss on two grounds: 1) that the partnership interests of the individual plaintiffs were not subject to the Securities Act registration requirements since they were "accounts . . . and transactions involving contracts of sale of a commodity for future delivery," 7 U.S.C. § 2, and therefore subject to the exclusive regulatory jurisdiction of the CFTC; and 2) that the complaint does not allege conduct amounting to a violation of the registration exemption.

In an earlier decision in this case (filed April 18, 1979), I dismissed an earlier complaint insofar as it alleged claims on behalf of Navigator for securities acts violations in connection with the commodities trading account which Shearson had induced Navigator to open. The basis for that decision was my finding that the commodities acts oust the federal courts of jurisdiction over actions alleging fraud in connection with commodities futures contract transactions. As I made clear in a subsequent memorandum order (filed May 1, 1979), my decision on that issue did not address the applicability of the securities acts to the limited partners' partnership interests in Navigator; only allegations involving Navigator's account with Shearson were subject to that holding.

■ The issue left open in the April 18 decision would presumably now be before

**13.** In holding that implied rights of action under the commodities acts survive both the 1974 and the 1978 amendments, I join a number of other district judges who have reached the same conclusion. *Hofmayer v. Dean Witter & Co.*, 459 F.Supp. 733 (N.D.Cal.1978); *Smith v. Groover, supra*; *R. J. Hereley Son Co. v. Stotler & Co.*, 466 F.Supp. 345 (N.D.Ill.1979); *Jones v. B. C. Christopher & Co.*, 466 F.Supp. 213 (D.Kan.1979). *But see National Super Spuds Inc. v. New York Mercantile Exchange*, 470 F.Supp. 1256 (S.D.N.Y.1979); *Beeman v. Bache, Halsey, Stuart, Shields Inc.*, Commod. Fut. L.Rep. (CCH) ¶ 20,796 (S.D.Ohio 1979); *Alkan v. Rosenthal & Co.*, Commod.Fut.L.Rep. (CCH) ¶ 20,797 (S.D.Ohio 1979).

me if the allegations under the securities laws on behalf of the individual partner plaintiffs were articulated with sufficient clarity to notify me (and the defendants) of the actions allegedly taken by the defendants in violation of the securities acts.[14] They are not so articulated, and I do not know what the plaintiffs claim. I do not intend to speculate myself, and I shall not require defendants to speculate. Count 2 of the complaint is dismissed without prejudice to the service and filing within ten (10) days of an application to file a proposed amended complaint [15] which sets forth with precision and with particularity the specific conduct by each of the defendants which is complained of, and which designates the specific provisions of the securities acts and the regulations thereunder which plaintiffs allege were violated by that conduct. If such an application, with proposed amended complaint, is not served and filed within ten (10) days, an order will be entered without further notice making it clear that this dismissal of Count 2 of the complaint is with prejudice.

SO ORDERED.

---

14. While it is apparently the Securities and Exchange Commission exemption which plaintiffs allege to have been violated, plaintiffs do not allege in what respects defendants violated it. Moreover, without explication, plaintiffs allege jurisdiction under, *inter alia*, "The Exchange Act § 10(b), 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5."

15. The complaints in this and an earlier identical action which was voluntarily dismissed have been amended, to date, seven times. I trust that this memorandum order makes it clear to plaintiffs' counsel that this is the final amendment. The federal courts have moved to the practice of notice pleading, but pleadings which are filed must give reasonable notice, with reasonable precision, of what is claimed. If the plaintiffs are claiming fraud, the specific activities alleged to constitute the fraud, and the specific provisions of the law and regulations which plaintiffs claim have been violated, *must be set forth so that the defendants may know*, and if possible meet, the charges, and so that the judge may have a basis for intelligent adjudication.