634 F.2d 774
 John RIVERS and Tom Lamb (Dan P. Rivers, as Executor of the
Will of John Rivers, substituted in place and
stead of John Rivers, Deceased),
Plaintiffs- Appellees,
v.
ROSENTHAL & COMPANY, Defendant-Appellant.
 No. 79-1313.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 16, 1980.
 
 Sidney O. Smith, Jr., James S. Stokes, IV, Peter Q. Bassett, Atlanta, Ga., Wyck A. Knox, Jr., Augusta, Ga., Louis Clinton Burr, Chicago, Ill., for defendant-appellant.
 Robert E. Goodfriend, Dallas, Tex., for Drexel, Burnham Lambert, Inc., amicus curiae.
 Albert H. Dallas, Thomson, Ga., Jerry L. Sims, Atlanta, Ga., for plaintiffs-appellees.
 Mark D. Young, Atty., Commodity Futures Trading Com'n, Washington, D.C., amicus curiae.
 Appeal from the United States District Court for the Southern District of Georgia.
 Before KRAVITCH, HENDERSON and REAVLEY, Circuit Judges.
 REAVLEY, Circuit Judge:
 
 
 1
 This appeal presents a single legal question: whether there exists an implied private right of action under the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1-24, as revised in 1974, to redress commodity futures customers for damages sustained from their brokers' violations of the antifraud provisions and broker registration requirements of that Act, 7 U.S.C. §§ 6b,[1] 6k,[2] and the corresponding regulations, 17 C.F.R. §§ 32.3, 32.9 (1979).[3] Relying upon such an implied right of action, as well as fraud and fiduciary violation grounds with which we are not here concerned, John Rivers and Tom Lamb brought suit below against Rosenthal & Company and an agent[4] in its Memphis, Tennessee office, Carl M. Tipton. Rivers and Lamb allege that in 1976 and 1977 they suffered substantial losses in commodity futures transactions conceived and carried out in their behalf by Tipton in violation of the antifraud and registration provisions noted above.
 
 
 2
 Arguing that no such private right of action exists, Rosenthal moved to dismiss under Fed.R.Civ.P. 12(b)(6), those counts of the complaint based on the alleged violations of the CEA. The district court determined that an implied right of action was available to Rivers and Lamb and denied the motion to dismiss. Upon the appropriate recommendation of the district court that the denial of this motion entailed a controlling and controversial question of law the immediate resolution of which would materially advance the ultimate termination of litigation, this court accepted the interlocutory appeal pursuant to 28 U.S.C. § 1292(b). We now reverse, holding that no implied private right of action is available to plaintiffs-appellees, Rivers and Lamb.[5]
 
 I. BACKGROUND
 
 3
 The question we face here has already received considerable judicial attention since the 1974 amendments to the CEA. Within the past half year the Second and Sixth Circuits have ruled that an implied private right of action does exist under the CEA, but both decisions were rendered by split panels over very forceful dissents. Leist v. Simplot, 638 F.2d 283 (2d Cir. 1980), petition for cert. filed sub nom. New York Mercantile Exchange v. Liest, 49 U.S.L.W. 3388 (U.S. Nov. 12, 1980) (No. 80-757) (per Friendly, J., finding right of action for contraventions of various sections, such as 7 U.S.C. §§ 6b, 7(d), 7a(8), 13(b), proscribing market manipulation, fraud, and dilatory behavior by exchanges; Mansfield, J., dissenting); Curran v. Merrill Lynch, Pierce, Fenner & Smith, 622 F.2d 216 (6th Cir. 1980), petition for cert. filed, 49 U.S.L.W. 3053 (U.S. Aug. 9, 1980) (No. 80-203) (private action for violation of antifraud provisions such as § 6b).[6] Since 1974 numerous district courts also have faced the issue, with a slight majority of these courts finding that a cause of action is available under various provisions.[7]
 
 A. Prior to 1974
 
 4
 The present federal statutory scheme for regulating the trading of commodity futures traces its lineage back to The Futures Trading Act, ch. 86, 42 Stat. 187 (1921), and its successor, The Grain Futures Act, ch. 369, 42 Stat. 998 (1922). These acts, limited to grain futures, inaugurated the pattern of restricting futures trading to designated "contract markets," i. e., central exchanges subject to government supervision and charged with adopting measures to prevent price manipulation.[8] Although these acts empowered the government to take some steps against individual price manipulations, in practice almost total reliance for the regulation of such activities rested with the individual exchanges.
 
 
 5
 In 1936, Congress significantly expanded the scope of federal regulation of the futures trading industry and retitled the legislation the "Commodity Exchange Act," ch. 545, 49 Stat. 1491 (1936). Under this Act, regulatory coverage went beyond grain futures to include other specified agricultural commodities. Additional substantive regulatory provisions were enacted, including an antifraud provision, § 4b, 49 Stat. 1493, in essentially the same form as that in the present codification, 7 U.S.C. § 6b, which forms one of the bases of this action. Greater direct government control of market abuses by individual traders also was established by the addition of criminal sanctions for violation of the proscription against price manipulation as well as fines and penalties for the transgressions of other provisions and by the vesting of broader powers of direct supervision and enforcement in the Department of Agriculture.
 
 
 6
 Notwithstanding this beefing up of the federal regulatory scheme, the principal emphasis and essential philosophy of the legislation remained one of industry self-regulation through the contract markets. Curran v. Merrill Lynch, 622 F.2d at 231; Stone v. Saxon & Windsor Group Ltd., 485 F.Supp. at 1214. Despite similar, though less expansive, amendments in 1968 that increased the sanctions and penalties under the CEA and added several new substantive requirements not pertinent here, Pub.L. 90-258, 82 Stat. 26 (1968), the basic approach of industry self-regulation continued until the drastic revision of the CEA in 1974.
 
 
 7
 Significantly for our purposes, the relatively limited role expressly legislated for the federal government to play in the active enforcement of this expanding regulatory scheme during the period 1922-1974 consisted of punitive or coercive mechanisms such as fines, removal of licenses, or criminal penalties-all sanctions against transgressors. Congress did not expressly provide for any federal judicial or administrative forum or remedy through which those injured due to fraud or other violations of the acts or regulations could seek redress from those transgressors.
 
 
 8
 By at least 1967 with the decision in Goodman v. H. Hentz & Co., 265 F.Supp. 440, 447 (N.D.Ill.1967), however, the courts began to fill that void by finding an implied private right of action under the CEA. See Leist v. Simplot, 638 F.2d at 309 (intimating that private actions may have been maintained prior to and in greater number than is indicated by only the published decisions). In fact, all courts that decided the issue held unanimously that such a private cause of action was available under the CEA as constituted prior to 1974. See, e. g., Deaktor v. L. D. Schreiber & Co., 479 F.2d 529, 534 (7th Cir. 1973), rev'd on other grounds sub nom. Chicago Mercantile Exchange v. Deaktor, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973) (cause of action under 7 U.S.C. § 13b); Booth v. Peavey Co. Community Services, 430 F.2d 132, 133 (8th Cir. 1970) (§ 6(d)); Arnold v. Bache & Co., Inc., 377 F.Supp. 61, 65 (M.D.Pa.1973) (§ 6b); McCurnin v. Kohlmeyer & Co., 340 F.Supp. 1338, 1343 (E.D.La.1972), aff'd per curiam, 477 F.2d 113 (5th Cir. 1973). But see Chipser v. Kohlmeyer & Co., 600 F.2d 1061, 1067 & n.14 (5th Cir. 1979) (suggesting existence of pre-1974 cause of action an open question upon remand); Moody v. Bache & Co., 570 F.2d 523, 528-29 (5th Cir. 1978). Moreover-although the correctness of these decisions is dubious when measured against the present wisdom for determining the existence of implied rights of action, see e. g., Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) ("TAMA") and Part II, infra-this course of allowing the victims of violations to take the initiative and hail their trespassing tormentors before the courts was basically consistent with that era's fundamental approach of relying principally upon the self-policing of the futures trade by those involved in it.
 
 B. 1974 Amendments
 
 9
 By the early 1970's, however, the vastly increased volume, scope and complexity of futures trading and the apparent inability of the individual exchanges to cope coherently and satisfactorily with these geometrically expanding problems compelled a reevaluation of that basic self-regulatory approach. S.Rep.No. 850, 95th Cong., 2d Sess. 8-10, reprinted in (1978) U.S.Code Cong. & Ad.News, pp. 2087, 2096-98; S.Rep.No. 1131, 93d Cong., 2d Sess., reprinted in (1974) U.S.Code Cong. & Ad.News, pp. 5843, 5858-59. The product of this re-evaluation was the Commodity Futures Trading Commission Act of 1974, Pub.L. 93-463, 88 Stat. 1389 ("CFTCA"). Different in character from even the significant amendments of 1936 and 1968, the CFTCA "signalled a dramatic shift from the theory of exchange self-regulation," upon which federal futures trading legislation had been premised up to that point, Leist v. Simplot, 638 F.2d at 309, and proposed in its place "a comprehensive regulatory structure" creating a coherent uniform system of federal control over the entirety of the national futures trading industry. H.R.Rep.No. 975, 93d Cong., 2d Sess. 1. Consequently, rather than comprising mere patchwork additions as had all prior amendatory schemes, the CFTCA actually constituted "the first complete overhaul of the Commodity Exchange Act since its inception." Id. (emphasis added).
 
 
 10
 The CFTCA dramatically expanded federal regulatory coverage beyond agricultural products to encompass futures trading in several categories of goods and services not previously regulated. See 7 U.S.C. §§ 2, 6c(a) & (b). The most significant changes pertinent to our consideration here, however, came in the total revamping of the regulatory oversight and enforcement systems designed to effectuate the shift in policy to a uniform, comprehensive federal control over the industry.
 
 
 11
 The focal point of this shift was the creation of the Commodity Futures Trading Commission ("CFTC"), a strong regulatory body, vested with exclusive jurisdiction over futures trading, 7 U.S.C. § 2, that was to be the keystone of the new comprehensive federal regulatory structure. Federal oversight responsibility over the daily functioning of the industry was greatly expanded through the CFTC. For example, the Commission was empowered to designate and to prescribe certain terms of operation for licensed contract markets, as well as to review all regulations and bylaws of these markets and to disapprove, alter or supplement those rules insofar as it deemed necessary. See, e. g., 7 U.S.C. § 12a(7). Further, the activities of certain classes of individual traders were for the first time brought under the federal eye by the requirement that they register periodically with the CFTC. See, e. g., 7 U.S.C. § 6k (one of the provisions forming the basis of plaintiffs' complaint here, requiring registration of associates of futures commission merchants).
 
 
 12
 Central to our concern are those provisions elaborately overhauling the comparatively limited enforcement scheme extant under the old law in order to assure compliance with the new oversight provisions above, and the many substantive standards of conduct that had been carried forward into the new statutory framework virtually unchanged (such as the antifraud provision, § 6b, involved here). Consistent with the shift in philosophy toward affirmative federal responsibility, this renovated enforcement system was greatly strengthened relative to prior law both by the enhancement of some old tools and by the addition of several potent new ones. See S.Rep.No. 850, supra at 11-12, 1978 U.S.Code Cong. & Ad. News at 2099-2100. For example, maximum civil penalties and fines assessable against individual violators and against contract markets that failed to enforce their rules were drastically increased from $10,000 to $100,000 per episode. See, e. g., 7 U.S.C. §§ 13a, 13b. The Commission also was newly empowered, for instance, to sue in federal court for injunctive relief whenever it appeared that an individual or contract market had engaged, was engaging, or was about to engage in conduct violating the Act or regulations, 7 U.S.C. § 13a-1, as well as to conduct disciplinary proceedings against exchange members, 7 U.S.C. § 12c, and revoke or suspend the registration or trading privileges of any such individual, 7 U.S.C. §§ 6n(6), 9, or contract market, 7 U.S.C. § 7b.
 
 
 13
 Most importantly, the 1974 Act for the first time expressly provided the means for persons injured by violations of the Act to seek redress from those responsible. First, each designated contract market was required to provide an arbitration or other informal procedure for the settlement of customers' claims and grievances involving less than $15,000.[9] 7 U.S.C. § 7a(11). Second, the Act established an administrative reparations procedure pursuant to which complaints might be filed with the CFTC against virtually any futures trading professional required to be registered under the Act. 7 U.S.C. § 18. The CFTC is obliged to investigate such complaints and, if warranted in the Commission's opinion, to allow the complainant to proceed against the alleged culprit before an administrative law judge either by hearing or by depositions or certified statements of facts, depending upon the size of the claim. 7 U.S.C. § 18(b). The administrative law judge in turn is authorized to rule upon the merits of the claim and to order payment of damages necessary to compensate the injured individual. See, e. g., Gordon v. Shearson Hayden Stone, Inc., 2 Comm.Fut.L.Rep. (CCH) P 21,016 (April 10, 1980). An order of payment is enforceable in federal district court, and the Commission's ruling on the merits of a claim may be appealed by either party to the court of appeals in the designated circuit. 7 U.S.C. § 18(f), (g).[10]
 
 
 14
 The question we face is whether an implied judicial private right of action also was meant to be included among the panoply of express enforcement tools in this "comprehensive regulatory structure" erected by the 1974 revision. We conclude that it was not.
 
 II. DEFINING THE INQUIRY
 
 15
 As indicated by our recent opinions in United States v. Capeletti Bros., Inc., 621 F.2d 1309, 1313 (5th Cir. 1980) and Rogers v. Frito-Lay, Inc., 611 F.2d 1074, 1078 (5th Cir.), cert. denied, --- U.S. ----, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980), this court continues to employ the factors articulated in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), as a guide to determining whether a cause of action should be inferred from any particular statutory scheme. In Cort the Supreme Court identified four factors it considered particularly relevant to this inquiry:
 
 
 16
 "First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted' ... that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one ...? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff ...? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?"
 
 
 17
 422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted, emphasis in original).
 
 
 18
 In its more recent pronouncements in Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 15, 23, 100 S.Ct. 242, 245, 249, 62 L.Ed.2d 146 (1979) ("TAMA ") and Touche Ross & Co. v. Redington, 442 U.S. 560, 568, 576, 99 S.Ct. 2479, 2485, 2489, 61 L.Ed.2d 82 (1979), however, the Supreme Court has made clear that the dispositive inquiry in evaluating claims upon implied rights of action is the divining of whether Congress intended such a cause of action to be born,[11] the second of the Cort criteria. Thus the Cort factors, rather than being utilized as some sort of self-contained litmus test, are useful only insofar as they help to elucidate that legislative intent.[12] Indeed, as the opinions in both TAMA and Touche Ross demonstrate, should the issue of intent be settled by, for example, the legislative history and the language or structure of the statute, the inquiry has reached its end and no purpose is served by the further ritualistic application of the remainder of the Cort litany.[13] TAMA, 444 U.S. at 23, 100 S.Ct. at 249; Touche Ross, 442 U.S. at 576, 99 S.Ct. at 2489.
 
 
 19
 As indicated above and as unquestioningly recognized by every court to entertain the issue, the focus of our inquiry is properly directed to the 1974 revision of the CEA. While many of the individual concepts and provisions originated in prior enactments, including § 6b (the antifraud provision), the overall "regulatory scheme as it exists today is a product of the 1974 amendments" and the drastic shift in regulatory philosophy that they represent. Navigator Group Funds v. Shearson Hayden Stone, Inc., 487 F.Supp. 416, 420 & n.6 (S.D.N.Y.1980). Thus it is the intent of that Congress and the legislative history of that enactment that will form the basis of our decision here.
 
 
 20
 This focus on what is basically revisionary legislation, as opposed to an altogether new and original enactment, requires some adjustment or at least some reevaluation of the conventional analytical approach, however. In particular and most importantly, the fact that a private cause of action had previously been inferred under the old statutory scheme in connection with certain express provisions (such as § 6b), which were incorporated or carried forward into the present structure, raises questions concerning the type of congressional intent we are bound to search for and where the axe should fall in the absence of any definitive evidence of intent.
 
 
 21
 As indicated in footnote 11, supra, an implied private right of action ordinarily may be recognized only upon clear evidence that Congress affirmatively intended to provide such a remedy. See Touche Ross, 442 U.S. at 568, 99 S.Ct. at 2485. Customarily, "those who contend a statute has endowed them with a cause of action must establish their proposition," and their failure to demonstrate Congress' intent to provide a cause of action compels the denial of such actions. Rogers v. Frito-Lay, 611 F.2d at 1085.
 
 
 22
 Plaintiffs, along with the CFTC as amicus curiae,[14] contend here, however, that because courts had uniformly recognized private rights of action under the CEA prior to 1974, it is the rejection of a private right that would constitute a change in the status quo. Moreover, they suggest, Congress was or must have been aware of this judicial stance. Therefore, they argue, the onus here should be upon the defendants to prove a congressional intent to alter this status quo by abrogating this previously existing cause of action in the course of the 1974 revision. This argument has some appeal and has been accepted and deployed by several courts, all of whom eventually upheld the existence of an implied private right. See, e.g., Leist, 638 F.2d at 303; Curran v. Merrill Lynch, 622 F.2d at 234; Alken v. Lerner, 485 F.Supp. 871, 877 (D.N.J.1980).
 
 
 23
 While we agree that some account must be taken of the pre-1974 judicial decisions inferring a cause of action and any congressional awareness of those decisions, we do not believe plaintiffs' suggested mode of analysis is appropriate to this case. As is recognized by the courts employing this approach, see, e.g., Leist, 638 F.2d at 303, 309-311, the thesis has its foundation in the traditional canon of construction that, absent express indications to the contrary, the reenactment of statutes in substantially the same form or their wholesale adoption into other statutory schemes is presumed to perpetuate and incorporate the judicial baggage that has accumulated in relation to those provisions. See, e.g., Lorillard v. Pons, 434 U.S. 575, 580-81, 98 S.Ct. 866, 869-70, 55 L.Ed.2d 40 (1978); Alabama Association of Insurance Agents v. Board of Governors, 533 F.2d 224, 245 (5th Cir. 1976), cert. denied, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978). We believe, contrary to Judge Friendly's assertions in Leist, 638 F.2d at 309-310, that the 1974 revision of the CEA simply does not fall within this paradigm.
 
 
 24
 The CFTCA was not a mere reenactment, but the "first complete overhaul" of the CEA. H.R.Rep.975, supra, at 1. While it is true as noted earlier that many of the substantive measures, such as the antifraud provision, 7 U.S.C. § 6b, were left untouched or were carried forward virtually unchanged into the new regulatory structure, the immediate context of those provisions was drastically changed. Most significantly, as delineated in Part I.B., supra, the enforcement scheme-which an implied right presumably had been thought necessary to supplement-was dramatically altered and expanded. So significant a transfiguration of the extant statutory framework is, itself, a wholesale obliteration of the prior status quo and sufficient reason for declining to adopt plaintiffs' analytical approach, grounded as it is in the reenactment doctrine described above. Stone v. Saxon & Windsor Group Ltd., 485 F.Supp. at 1221; Smith v. Groover, 468 F.Supp. 105, 112-113 (N.D.Ill.1979) (rejecting the identical approach urged here by plaintiffs and CFTC as amicus curiae).[15] Our decision to continue to require proof of affirmative congressional intent to provide a private right of action is further grounded in a related reason, however, calling into play still another canon that guides inquiries into the existence of implied causes of action.
 
 
 25
 As outlined in Part I.B., supra, Congress greatly expanded the federal regulatory enforcement arsenal in the 1974 Act by expressly enacting several potent new judicial and administrative tools and strengthening many of those previously contained in the CEA. Most significantly, for the first time it expressly provided for remedial mechanisms-the administrative reparations procedure, 7 U.S.C. § 18, and the requirement that exchanges provide the means for arbitration of small claims, 7 U.S.C. § 7a(11)-through which those injured by violations of the Act could seek compensation from the infractors.
 
 
 26
 "(I)t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." TAMA, 444 U.S. at 19, 100 S.Ct. at 247. Thus Congress' express provision in 1974 of the numerous judicial and administrative means for enforcing compliance with the antifraud and other provisions of the CEA-and most particularly the remedial mechanisms of arbitration and reparations procedures-in effect creates a presumption against the implication of yet another unexpressed judicial means of enforcement and remedy.[16] This "presumption" against finding an implied right of action may be overcome, but only upon "clear contrary evidence of legislative intent" affirmatively to provide such an implied right in addition to the express remedies. National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974) ("Amtrak "). Accord, e.g., TAMA, 444 U.S. at 19, 100 S.Ct. at 247; Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 419, 95 S.Ct. 1733, 1738, 44 L.Ed.2d 263 (1975). Therefore, following the pattern of TAMA, we conclude that the onus remains upon plaintiffs to demonstrate "a clear and affirmative congressional intent to approve a private right of action."[17] Leist, 638 F.2d at 340 (Mansfield, J., dissenting). Accord, Stone v. Saxon & Windsor Group Ltd., 485 F.Supp. at 1218, 1220.
 
 
 27
 The history of judicial recognition of a private cause of action under the CEA prior to 1974 justifies some adjustment to and tailoring of the traditional formulation of the precise nature of congressional intent that must be shown. Rather than requiring establishment of a legislative intent to create a cause of action, we will require proponents of the implied right here to show, first, simply that Congress was actually aware in 1974 of this prior judicial recognition of an implied right of action, and second, that it approved these holdings and affirmatively intended to adopt or incorporate this extant, judicially articulated, right of action into the comprehensive express legislative enforcement scheme erected by the 1974 Act.[18] It is to this precise inquiry, in addition to the arguments and evidence put forth by plaintiffs, along with our sister courts' attempt to satisfy this inquiry, that we now turn our attention.
 
 III. CONGRESSIONAL INTENT
 A. Content of Act and Legislative History
 
 28
 The direct sources from which plaintiffs might demonstrate the requisite congressional intent to provide, or to continue to provide, a private right of action are the legislative history, language and structure of the 1974 Act. Our study of these sources, however, guided by the plaintiffs' arguments, fails to yield any such "clear ... evidence of legislative intent" to adopt such a private right.
 
 
 29
 Plaintiffs rely first on several passages of legislative history which, they argue, plainly demonstrate that Congress was aware in 1974, during its deliberations on the CFTCA, of the consistent judicial recognition of implied private rights under the CEA prior to that time. They point initially to two statements in H.R.Rep.No. 975, supra, at 46, 48, referring to the growth of private suits against contract markets for the failure to enforce their own rules as well as for actions taken in emergency situations. Representative Poage, the sponsor of H.R.11955 (the version of the legislation that later passed the House as H.R.13113, 93d Cong., 2d Sess. (1974) U.S.Code Cong. & Ad.News, p. 5843), also made essentially the same observation on the House floor. 119 Cong.Rec. 41333 (1974). Plaintiffs also point to several mentions of the existence of a private right of action by witnesses before the House and Senate Committees conducting hearings on the commodity futures legislation. Hearings before the Senate Committee on Agriculture and Forestry on S.2485, S.2578, S.2837, and H.R.13113, 93d Cong., 2d Sess. 415, U.S.Code Cong. & Ad.News, p. 5843 (1974) (hereinafter "Senate hearings") (statement of Alvin Donahoo, Minneapolis Grain Exchange, noting court litigation as extant alternative to proposed arbitration procedures); Hearings before the Comm. on Agriculture on H.R.11955, 93d Cong., 2d Sess. 249, 321 (1974) (hereinafter "House Hearings") (statements of representatives of international commodity exchanges and the Continental Grain Company, respectively, observing that in addition to the proposed reparations and exchange arbitration procedures "complainants of course have access to the courts," p. 249, and that "courts ... have already held they have jurisdiction over private complaints," p. 321). See also Senate Hearings, supra, at 737, 746 (statement of Professor Roy Schotland, arguing for an express private right of action and assurance "that Federal and State courts are still open" (emphasis added)).
 
 
 30
 Stated charitably, we are less certain than are the plaintiffs and several of our sister courts[19] that these few fleeting references-sometimes cryptic and all comparatively isolated among the hundreds of pages of testimony and debate that comprise the legislative history of the 1974 Act-are sufficient to establish that the entire Congress was even aware of and duly considered the existence of any previously inferred cause of action in its deliberations and vote upon the CFTCA. See SEC v. Sloan, 436 U.S. 103, 119-123, 98 S.Ct. 1702, 1712-14, 56 L.Ed.2d 148 (1978);[20] Tennessee Valley Authority v. Hill, 437 U.S. 153, 191-194, 98 S.Ct. 2279, 2300-01, 57 L.Ed.2d 117 (1978). Plainly, the consideration of the prior judicial interpretations here involved much less attention, even among the legislators and witnesses noted above, than the "extensive (legislative) deliberations" (albeit in hearings) of the Supreme Court's prior interpretation of a provision of the Voting Rights Act from which, in Georgia v. United States, 411 U.S. 525, 532-33, 93 S.Ct. 1702, 1707, 36 L.Ed.2d 472 (1973), the Court presumed general congressional awareness and acceptance of that interpretation in the reenactment of the provision. See note 15, supra.
 
 
 31
 Nonetheless, even assuming that these remarks demonstrate Congress' awareness of the prior judicial recognition of an implied right under the CEA[21] and that the first prong of our inquiry (delineated in Part II, supra) is satisfied, these passages unquestionably give no indication that Congress approved of and intended to perpetuate such actions as a part of the elaborate express enforcement scheme that it was in the process of fashioning.[22] Proof of such approval is, of course, the vital element of congressional intent which plaintiff must establish.[23]
 
 
 32
 For their demonstration of congressional approval and adoption of the judicially created right of action, then, plaintiffs rely almost totally on the jurisdictional savings proviso of 7 U.S.C. § 2. Set amid the ascription of exclusive jurisdiction over futures trading to the CFTC, this proviso states that "(n)othing in this section[24] shall supersede or limit the jurisdiction conferred on courts of the United States ...." This, plaintiffs contend, affirmatively demonstrates the intent of Congress to retain the power of the courts to entertain private actions under the CEA. See A. Bromberg & R. Lowenfels, Securities Fraud & Commodities Fraud § 461 at 82.362-.363 (1979).
 
 
 33
 The language of the proviso does not clearly evince an intent to approve of implied private actions, however,[25] and the legislative history relevant to this specific proviso indicates that it probably was intended to serve another purpose entirely. The House, Senate and Conference reports all are mute as to the purpose behind the proviso, which was added to H.R.13113 in the Senate. Allusions to the provision during debates on the floor are similarly unenlightening.
 
 
 34
 Only recourse to the attenuated source of hearing testimony gives any hope of insight. Plaintiffs argue, therefore, that the proviso was enacted in response to the admonitions of Senator Dick Clark and Professor Roy Schotland that some sort of express assurance should be given complainants that the courts were still open to them under the new Act. Senate Hearings, supra, at 205, 737 & 746.[26]
 
 
 35
 Rosenthal contends, on the other hand, that the more likely stimulus for the proviso was the statement of the Chairman of the House Judiciary Committee, Representative Peter Rodino, Senate Hearings, supra, at 257-60, and the testimony of Deputy Assistant Attorney General Keith Clearwaters directly attacking the exclusive jurisdiction provision of § 2 to which the proviso was eventually added, id. at 663-64. The concern of both these witnesses was that the all-encompassing language of § 2, allocating to the CFTC exclusive jurisdiction over the futures trade, was so broad that it even "could be interpreted to deprive Federal courts of their jurisdiction under the antitrust laws and to deprive Federal and State courts of jurisdiction to enforce contract and commercial law rights" in the futures area. Id. at 663. Because the statements, as opposed to those relied upon by plaintiff, are derived from extensive and pointed attacks on the very section that the proviso later served to amend and because they, like the proviso itself, are directed to the question of jurisdiction as opposed to a single cause of action, see note 25, supra, the Rodino-Clearwaters' statements do appear to be the somewhat more likely source for the proviso.
 
 
 36
 Unfortunately, we may only speculate since, as stated above, Congress gave us no indication of which, if either, of these sets of comments spurred it to add the proviso of § 2. We are likewise unable to deduce the answer with any certainty solely on the basis of the nature of the comments. Even this statement and the sheer speculativeness of the true answer, however, effectively blunt plaintiffs' reliance on the § 2 proviso as a "clear and affirmative" indication of congressional intent to approve or adopt an implied cause of action.
 
 
 37
 Plaintiffs find little support elsewhere in the legislative history of the 1974 Act.[27] On the other hand, appellant Rosenthal seeks to solidify its case further by arguing that at least one aspect of that legislative history indicates an intent to deny the existence of a private cause of action.
 
 
 38
 In the process of enacting the CFTCA, Congress considered, but failed to adopt, no fewer than three bills containing express private rights of action. H.R.11195, 93d Cong., 1st Sess. § 17(3) (1973); S.2837, 93d Cong., 1st Sess. § 505 (1973); S.2578, 93d Cong., 1st Sess. § 203(3) (1973). The weight to be given to a failure to enact such a provision-not an outright rejection by vote of either house-is unclear. Compare Amtrak, 414 U.S. at 460-61, 94 S.Ct. at 694. ("Committee's deliberate failure to adopt that proposal ... cannot but give weight" to the committee's disapproval of the principle contained in the proposal) with Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381-82 n.11, 89 S.Ct. 1794, 1802 n.11, 23 L.Ed.2d 371 (1969) ("unsuccessful attempts at legislation are not the best guides to legislative intent"). Whatever clear inference might ordinarily be drawn from such an occurrence is largely undercut here by the fact that each of the bills provided for treble damages, at least for willful violations of the Act. Congress' refusal to adopt these bills might just as reasonably be presumed to have derived from an opposition to treble damages as from an opposition to the damage remedy itself. Alken v. Lerner, 485 F.Supp. at 877. Consequently, this indicator of Congress' purported intent to deny private rights of action is hardly less equivocal than those relied upon by plaintiffs to show the opposite intent.[28]
 
 
 39
 Having failed to distill any tangible evidence of affirmative congressional intent from the legislative history, language or structure of the 1974 Act, plaintiffs next argue that a congressional purpose to provide a cause of action may be inferred simply from the context or zeitgeist in which the legislation was enacted. They rely for this assertion on the discussion in Cannon v. University of Chicago, 441 U.S. 677, 698, 99 S.Ct. 1946, 1958, 60 L.Ed.2d 560 (1979), to the effect that statutes, such as the CFTCA, enacted during a period when the courts were much more liberal in their approach to implied rights of action, see, e. g., J. I. Case v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964), must be judged in light of that "contemporary legal context."[29] From this, they contend that it must be presumed, in the absence of contrary evidence, that Congress expected the judiciary to supply any cause of action consistent with the prevalent pattern of interpretation of that time. Accord, Navigator Group Funds v. Shearson Hayden Stone, 487 F.Supp. at 421 (applying the Cannon thesis to CFTCA); Alken v. Lerner, 485 F.Supp. at 876-77 (same).
 
 
 40
 We agree that the liberal judicial climate in which the CFTCA was born requires us to be more solicitous and sensitive to indications of Congress' desire to create a cause of action. Indeed, any indication that Congress actually intended merely to leave the question to the judiciary to be resolved according to its contemporary rules of construction, while clearly inadequate under current standards, would likely be sufficient to carry the day here.
 
 
 41
 The prior judicial activism and our present duty of solicitousness because of that, however, cannot alter the constitutional requirement, see note 11, supra, that a cause of action be created only by Congress. There must be some expression of affirmative congressional intent either to provide a cause of action or at least to rely on the context of judicial activism contemporary to the enactment (though the latter is somewhat unrealistic). In Cannon, for example, the Court observed that Congress "explicitly assumed that (the statute in question) would be interpreted and applied as" had the statute upon which it was patterned, including the judicial recognition or creation of an implied cause of action thereunder. 441 U.S. at 693-696, 99 S.Ct. at 1956-57 (emphasis added). We have received no such message from the enactors of the CFTCA.
 
 
 42
 Finally, plaintiffs contend that the legislative history of the 1978 amendments-specifically certain remarks of Senators Huddleston and Leahy during debate on the Senate floor-demonstrate Congress' assumption and understanding that implied private actions are available under the Act. Initially, we note that the views of subsequent Congresses (and particularly the isolated remarks of individual legislators) hardly provide the most persuasive evidence of the intent of the enacting Congress. Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 117, 100 S.Ct. 2051, 2060-61, 64 L.Ed.2d 766 (1980); Rogers v. Frito-Lay, 611 F.2d at 1080-81. However, virtually every court to consider the issue before us since 1978 has taken into account, with varying degrees of deference, the legislative history of the 1978 amendments. Moreover, we are reminded by other Supreme Court opinions that "while the views of subsequent Congresses cannot override the unmistakable intent of the enacting one, ... such views are entitled to significant weight, ... and particularly so when the intent of the enacting Congress is obscure." Seatrain Shipbuilding Corp. v. Shell Oil Co., 444 U.S. 572, 596, 100 S.Ct. 800, 814, 63 L.Ed.2d 36 (1980) (citations omitted). Accord, Cannon v. University of Chicago, 441 U.S. at 686 n.7, 99 S.Ct. at 1952 n.7 (subsequent legislative history not as pertinent as contemporary history, but helpful to some extent). Therefore, we shall attempt to glean what we can from this field of legislative material.
 
 
 43
 The remarks in question of Senators Huddleston and Leahy, reproduced in the margin,[30] do indicate a clear assumption on the part of these two legislators that an implied private right of action was available under the CEA even after the 1974 revision. There is no indication elsewhere, however, that this assumption was shared by the remainder of Congress. In fact, certain other aspects of the 1978 legislative history imply the absence of such an assumption on the part of Congress as a whole.
 
 
 44
 For example, the Senate report on the bill, S.Rep.No.850, 95th Cong., 2d Sess., reprinted in (1978) U.S.Code Cong. & Ad.News, p. 2087, twice catalogs the means by which "customers are afforded protection" under the CEA, and each time conspicuously omits to mention an implied private right of action. Id. at 12-13, 32, U.S.Code Cong. & Ad.News at 2100-2101, 2120 (the latter passage states, in reference to a provision not included in the bill as enacted, that "(a)ggrieved customers ... would have the choice of seeking resolution of their claims through association arbitration or reparations proceedings or a Commission reparations proceeding"). See also H.R.Rep.No. 975, supra, at 22 (similarly noting that the reparations procedure was "designed to supplement the informal 'settlement procedures' contemplated of the contract markets ... which are required under other sections of the legislation," omitting any reference to such a procedure being supplementary to any judicial forum).
 
 
 45
 A second indicator that the assumption expressed by Senators Huddleston and Leahy was not one shared by the remainder of Congress is found in the 1978 amendment expressly providing a cause of action to the states, 7 U.S.C. § 13a-2.[31] Section 13a-2(2) provides exclusive jurisdiction to the federal courts for suits based on violations of the CEA and brought by states under this section. No such provision exists with respect to the Act generally. The rationale behind this reservation of exclusive jurisdiction is two-fold: (1) to draw upon the extensive experience developed exclusively in federal courts in similar cases under the Securities Exchange Act of 1934 under which they similarly hold exclusive jurisdiction, 15 U.S.C. § 78aa, and (2) by means of recourse to this experience, to evolve a unified "coherent body of (decisional) law" under the CEA. S.Rep.No. 850, supra, at 25, 1978 U.S.Code Cong. & Ad.News at 2113. In view of these goals, it would be anomalous indeed for Congress to require exclusive jurisdiction only of these relatively infrequent suits by states while continuing to countenance an implied cause of action, without such a restriction, for any individual who cares to sue. The natural inference is, therefore, that no such individual suits were contemplated.
 
 B. Consistency With Statutory Goals
 
 46
 Our final inquiry is that directed by the third Cort criterion. Like our excursion into more direct indicators of legislative intent, this foray also yields only conflicting or equivocal results. It is, of course, true that the recognition of an implied private right of action for damages would provide another, perhaps useful, enforcement tool in harmony with the aim of the CEA to protect futures customers from fraud and market manipulation. Curran v. Merrill Lynch, 692 F.2d at 234-35.[32]
 
 
 47
 As noted earlier, however, a second goal of the 1974 legislation was to create a "uniform regulatory structure" evolving a coherent body of law coordinated by the CFTC. S.Rep.No. 850, supra, at 10, 25, 1978 U.S.Code Cong. & Ad.News at 2098, 2113; H.R.Rep.No. 975, supra, at 1. In order to effectuate this purpose, "(t)o assure that the body of decisional laws developed under (the CEA) would be coherent and consistent with national policy," the Senate version of the 1978 amendments initially required states to receive approval from the CFTC before they could bring an action under § 13a-2. S.Rep.No. 850, supra, at 26, 1978 U.S.Code Cong. & Ad.News at 2114. Although this provision was not incorporated into the bill as finally enacted, the same function was to be served by the provision in the Act as passed, § 13a-2(3), requiring states to notify the Commission of their intent to file suit and guaranteeing the Commission's right to intervene in any such suit.
 
 
 48
 From these restrictions and the remarks in the Senate report, it is apparent that Congress perceived even infrequent uncontrolled suits for damages even by the state governments as a threat to the goal of developing a coherent and consistent body of law. Yet, as was the case with respect to the similar concern over the exclusivity of federal jurisdiction, above, no such restraints or safeguards would be placed by the statute as presently constituted on the potentially much more numerous and diverse suits that would be lodged pursuant to an implied private cause of action. In this situation we are counselled by the Supreme Court's admonition in Santa Clara Pueblo v. Martinez, 436 U.S. 49, 64, 98 S.Ct. 1670, 1680, 56 L.Ed.2d 106 (1978): "(w)here Congress seeks to promote dual objectives in a single statute, courts must be more than usually hesitant to infer from its silence a cause of action that, while serving one legislative purpose, will disserve the other."IV. CONCLUSION
 
 
 49
 The foregoing analysis of the language, structure and legislative history of the 1974 version of the CEA and its 1978 amendments obviously has yielded a result that might be described as emphatically equivocal. Although some individual passages or aspects of the Act appear to give some insight, these inferences frequently conflict with those from other passages or, upon closer examination, their apparent persuasiveness dims or vanishes. Chief Justice Marshall once observed that "(w)here the mind labours to discover the design of the legislature, it seizes everything from which aid can be derived ...." United States v. Fisher, 2 Cranch. 358, 386, 2 L.Ed. 304 (1805), quoted in, Brown v. General Services Administration, 425 U.S. 820, 825, 96 S.Ct. 1961, 1964, 48 L.Ed.2d 402 (1976). After our analysis of the legislative material and decisions of other courts on this question, we might add that in this metaphysical pursuit of prescience the mind often snatches at shadows and mirages in its attempt to discern evidence of such congressional design-a singularly inappropriate base upon which to predicate an implied private cause of action.
 
 
 50
 The net result of our study and deliberations in this case is the determination that the language and legislative history of the CEA and CFTCA, dissected by all of the varied and even conflicting canons of construction, simply do not provide any clear indication of congressional intent either to approve or deny an implied right of action. In such a case, as explained in Part II, supra -given the absence of clear evidence of the requisite affirmative congressional intent to create or provide such a cause of action-we are bound to refuse plaintiffs' suit.
 
 
 51
 Accordingly, the order of the district court denying appellants' motion to dismiss plaintiffs' claims under the CEA is REVERSED and the case REMANDED.
 
 
 
 [1]
 7 U.S.C. § 6b provides, in pertinent part:
 It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person, or (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person if such contract for future delivery is or may be used for (a) hedging any transaction in interstate commerce in such commodity or the products or by-products thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof-
 (A) to cheat or defraud or attempt to cheat or defraud such other person;
 (B) willfully make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;
 (C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person;
 
 
 [2]
 7 U.S.C. § 6k provides, in pertinent part:
 (1) It shall be unlawful for any person to be associated with any futures commission merchant or with any agent of a futures commission merchant as a partner, officer, or employee (or any person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation or acceptance of customers' orders (other than in a clerical capacity) or (ii) the supervision of any person or persons so engaged, unless such person shall have registered, under this chapter, with the Commission and such registration shall not have expired nor been suspended (and the period of suspension has not expired) or revoked, and it shall be unlawful for any futures commission merchant or any agent of a futures commission merchant to permit such a person to become or remain associated with him in any such capacity if such futures commission merchant or agent knew or should have known that such person was not so registered or that such registration had expired, been suspended (and the period of suspension has not expired) or revoked: Provided, That any individual who is registered as a floor broker or futures commission merchant (and such registration is not suspended or revoked) need not also register under these provisions.
 
 
 [3]
 See also 7 U.S.C. §§ 6b, 12a(5) (providing authority for promulgation of regulations and proscribing their contravention)
 
 
 [4]
 7 U.S.C. § 4 imposes upon principals such as Rosenthal the responsibility for the acts and omissions of their agents
 
 
 [5]
 The named parties are joined on this appeal by the Commodity Futures Trading Commission ("CFTC") and Drexel Burnham, Lambert, Inc., as amici curiae. The CFTC appears in favor of the implied right, Drexel in opposition. The court is indebted to them for their scholarly contributions
 
 
 [6]
 As of this writing, these are the only other two circuits to have engaged in a reasoned analysis of the existence of an implied private right of action under the CEA as constituted following the 1974 revision. But see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Goldman, 593 F.2d 129, 133 n.7 (8th Cir.), cert. denied, 444 U.S. 838, 100 S.Ct. 76, 62 L.Ed.2d 50 (1979) (noting summarily in dictum that "(s)uch actions are well recognized."); Hirk v. Agri-Research Council, Inc., 561 F.2d 96, 103 & n.8 (7th Cir. 1977) (similar perfunctory assertion). This court has not faced the issue heretofore, although twice since 1974 it has expressly reserved decision on the existence of a cause of action under the Act as constituted prior to the 1974 amendments. Chipser v. Kohlmeyer & Co., 600 F.2d 1061, 1067 & n.14 (5th Cir. 1979); Moody v. Bache & Co., Inc., 570 F.2d 523, 528-29 (5th Cir. 1978)
 
 
 [7]
 Compare, e. g., Grayson v. ContiCommodity Serv. Inc., 2 Comm.Fut.L.Rep. (CCH) P 21,033 (D.D.C. May 23, 1980) (action pursuant to 7 U.S.C. § 6b); Navigator Group Funds v. Shearson Hayden Stone, Inc., 487 F.Supp. 416 (S.D.N.Y.1980) (§ 6b); Alken v. Lerner, 485 F.Supp. 871 (D.N.J.1980)(§ 6b); Smith v. Groover, 468 F.Supp. 105 (N.D.Ill.1979) (§§ 6b, 13a, 13b); Poplar Grove Planting & Refining Co. v. Bache Halsey Stuart, Inc., 465 F.Supp. 585, 589-90 (M.D.La.1979) (§§ 6b, 6d), all finding implied private rights of action, with, e. g., Stone v. Saxon & Windsor Group Ltd., 485 F.Supp. 1212 (N.D.Ill.1980) (construing §§ 6c(b), (c)); Sunnyside Eggs, Inc. v. Urner Barry Publ., Inc., No. 78-1661A (N.D.Ga. Mar. 28, 1980) (§ 13b); Fischer v. Rosenthal & Co., 481 F.Supp. 53 (N.D.Tex.1979) (§ 6b); Bartels v. International Commodities Corp., 435 F.Supp. 865 (D.Conn.1977) (§ 6b), all ruling that no private cause of action exists under the CEA as amended in 1974. See also Hofmayer v. Dean Witter & Co., Inc., 459 F.Supp. 733 (N.D.Cal.1978) (finding right of action under fraud provisions, §§ 6b and 6o, but not for violation of registration provisions, §§ 6k and 6n (as alleged here), or for violation of exchange rules)
 
 
 [8]
 The mechanism through which the 1921 Act was to accomplish its systemization of the national futures trade-i. e., by the levying of a tax on all grain futures contracts traded other than on licensed contract markets-soon was declared an unconstitutional exercise of the taxing power. Hill v. Wallace, 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822 (1922). Almost immediately, however, Congress redrafted the substantive provisions, substituted for the offending tax section a simple proscription of all futures dealings other than on licensed contract markets, and reenacted the whole pursuant to its power to regulate interstate commerce as The Grain Futures Act. The Supreme Court upheld the new Act as constitutional in Board of Trade v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839 (1923)
 
 
 [9]
 As indicated by this provision, the role of the individual exchanges, particularly in the enforcement vein, was not totally extinguished despite the shift in policy toward a more uniform, government-controlled regulatory system. See also 7 U.S.C. § 21 (enabling provision for the creation of registered futures associations formed to engage in broad industry self-regulation)
 
 
 [10]
 The CEA was significantly amended again in 1978. Futures Trading Act of 1978, Pub.L. 95-405, 92 Stat. 865. These alterations took the form primarily of adjustments to the framework erected in 1974. The most significant changes for our purposes were the modification of the reparations procedure to allow full-fledged hearings only for claims greater than $5,000 (as opposed to $2,500 in the original enactment), 7 U.S.C. § 18(b) & (c), and the addition of a new provision expressly allowing the attorneys general of the various states to lodge damage actions in federal courts on behalf of their residents against alleged violators of the Act, 7 U.S.C. § 13a-2. These amendments and their legislative history will be discussed more fully as they appear pertinent to the analysis below
 
 
 [11]
 This conclusive reliance upon congressional intent in the evaluation of claims of implied rights of action is not simply an expedient tool or canon of construction, but is rooted in the limitations of the functional role allotted the judiciary by the Constitution. United States v. Capeletti Bros., 621 F.2d at 1312; Rogers v. Frito-Lay, 611 F.2d at 1078. See also Cannon v. University of Chicago, 441 U.S. 677, 742, 99 S.Ct. 1946, 1981-85, 60 L.Ed.2d 560 (1979) (Powell, J., dissenting). Although we may breathe practical life into them, the federal judiciary-endowed with no legislative or policy making authority-has no power to "imply" or otherwise to create private causes of action supplementary to express statutory schemes. Rather, we may only recognize or infer rights of action affirmatively created by the Legislative Branch, whether that affirmative legislative intent is manifested expressly in statutory language or by implication in statutory structure, context, or legislative history. That this approach may justifiably be characterized as a retrenchment from that applied in the recent past, when causes of action might have been judicially "implied" merely upon a court's policy determination that such a cause would be useful or "necessary" to statutory goals, is a lamentable indictment of our past failure to recognize or confine ourselves to our constitutionally assigned role and our concomitant willingness to countenance Congress' abdication to the courts of its constitutionally assigned policy making responsibility. See Cannon v. University of Chicago, 441 U.S. at 742-749, 99 S.Ct. at 1981-85 (Powell, J., dissenting). See also, TAMA, 444 U.S. at 23, 100 S.Ct. at 249 (Powell, J., concurring and indicating that the approach deployed there was consistent with his Cannon dissent)
 
 
 [12]
 Since the primary indicators of legislative intent are the language and overall structure of a statute as well as its legislative history and the context of its enactment, the first and third of the Cort factors are useful guideposts to intent, although not as directly to the point as the inquiry directed by the second criterion. Touche Ross, 442 U.S. at 576, 99 S.Ct. at 2489; Rogers v. Frito-Lay, 611 F.2d at 1078-79 n.4
 
 
 [13]
 Our path is smoothed somewhat in that respect here by appellant Rosenthal's decision not to dispute two of the four Cort criteria. Appellant first has conceded, as it must, that regulation of the commodity futures trade plainly is not an area traditionally relegated to state law. Therefore, this fourth factor, to the extent that it carries any weight, balances in favor of the plaintiffs and will not be discussed further. Appellant further conceded in its Reply Brief that the first Cort factor-that plaintiffs are members "of a class for whose especial benefit to the statute was enacted"-should similarly be resolved in plaintiffs' favor. We are less certain of the correctness or advisability of this concession, particularly in light of this court's rigorous analysis of this factor in United States v. Capeletti Bros., 621 F.2d at 1313-14. Also, compare TAMA, 444 U.S. at 23, 100 S.Ct. at 249 (observing that § 206 of the Investment Advisors Act, 15 U.S.C. § 806-6 (an antifraud statute strikingly similar to that in issue here), "concededly was intended to protect the victims of the fraudulent practices it prohibited") with Cannon v. University of Chicago, 441 U.S. 677, 690 n.13, 99 S.Ct. 1946, 1955 n.13 (1979) (intimating in dictum that rule 10b-5 under the Securities Exchange Act of 1934 merely "create(s) duties on the part of persons for the benefit of the public at large" rather than a right in specific persons). See also Leist v. Simplot, 638 F.2d at 304-307, dissent at 334-338 (majority and dissent differ with regard to "especial benefit" factor when CEA applied to futures "speculators"). In fact, concession of this factor might have seriously skewed our analysis of the case under the puzzling assertion by the Supreme Court in Cannon that where "it is clear that federal law has granted a class of persons certain rights, it is not necessary to show an intention to create a cause of action, although an explicit purpose to deny such a cause of action would be controlling." 441 U.S. at 693, 99 S.Ct. at 1956, quoting Cort v. Ash, 422 U.S. at 82, 95 S.Ct. at 2089 (dictum) (emphasis in original)
 The Supreme Court has more recently observed in TAMA, however, that "the mere fact that the statute was designed to protect advisers' clients does not require the implication of a private cause of action for damages on their behalf. (citations omitted). The dispositive question remains whether Congress intended to create any such remedy." 444 U.S. at 24, 100 S.Ct. at 249. We can only assume that this statement serves to repudiate the curious allusion in the Cannon statement to a drastically more liberal approach to "intent" where the first Cort criterion is satisfied. At the least, insistence upon the strict standard would seem reasonable in situations where (as opposed to Cannon) any "rights" of the class, at least potentially, may be adequately secured by the statute's express remedies. Consequently, we shall assume, arguendo, the correctness of appellants' concession and analyze this factor no further as well, directing our attention only toward the second and third Cort criteria.
 
 
 [14]
 Through its appearance here and in other litigation, along with its official pronouncements on the subject, see 41 Fed.Reg. 3994 (1976), the CFTC has made clear its belief that an implied right of action is available to private litigants. Ordinarily the interpretation of a statute by the agency charged with its administration would be entitled to great deference. See United States v. Consumer Life Ins. Co., 430 U.S. 725, 752, 97 S.Ct. 1440, 1454, 52 L.Ed.2d 4 (1977). The Supreme Court made clear in Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 41 n.27, 97 S.Ct. 926, 949 n.27, 51 L.Ed.2d 124 (1977), however, that such deference was not to be accorded on the narrow issue, "reserved for judicial resolution," of whether an implied right of action should be recognized under the statute
 
 
 [15]
 Cf. Georgia v. United States, 411 U.S. 526, 532-33, 93 S.Ct. 1702, 1706-07, 36 L.Ed.2d 472 (1973) (applying the reenactment doctrine to uphold perpetuation of Supreme Court interpretation of the provision reenacted, with some changes in context, where, unlike here, that prior interpretation had been the subject of "extensive deliberations" at least in hearings, and Congress had thereafter done nothing to alter or foreclose that interpretation)
 
 
 [16]
 Indeed, the presumption is much more appropriately suited to this case than to the TAMA decision from which the formulation of the rule quoted in text was drawn. Navigator Group Funds v. Shearson Hayden Stone, Inc., 487 F.Supp. at 420. There the Supreme Court declined to infer a private cause of action for damages largely on the basis of express enforcement provisions merely aimed at sanctioning violators of the substantive provisions. As the court in Navigator Group Funds observed, the express provisions of the CFTCA include compensatory remedial mechanisms which are more truly functional alternatives to the implied judicial forum sought by injured customers. 487 F.Supp. at 420
 
 
 [17]
 We adopt this approach and embark on our analysis fully cognizant that application of plaintiffs' suggested approach, as in Leist and Alken, very well might-indeed, probably would -produce a different final result
 
 
 [18]
 Given such proof, the actual correctness or incorrectness of these earlier judicial decisions would be largely immaterial. "For the relevant inquiry is not whether Congress correctly perceived the then state of the law, but rather what its perception of the state of the law was." Brown v. General Services Administration, 425 U.S. 820, 828, 96 S.Ct. 1961, 1965, 48 L.Ed.2d 402 (1976). Thus, if Congress embraced such a cause of action and intended its perpetuation in the revised regulatory system, this affirmative intent renders completely irrelevant to our purposes the question of the propriety, under whatever standards, of the decisions originally giving birth to the cause of action. Accord, Cannon v. University of Chicago, 441 U.S. at 709, 99 S.Ct. at 1964
 
 
 [19]
 E. g., Leist v. Simplot, 638 F.2d 283 at 308-310; Curran v. Merrill Lynch, 622 F.2d at 234; Alken v. Lerner, 485 F.Supp. at 877; Smith v. Groover, 468 F.Supp. at 113
 
 
 [20]
 In Sloan, the Supreme Court rejected the SEC's contention that its longstanding interpretation of a particular section of the Securities Exchange Act of 1934 had been essentially incorporated into that section by Congress' reenactment of the provision in substantially the same form. In doing so, even though the Senate committee overseeing the reenactment had not only acknowledged but expressly approved of the SEC's construction in its official report, the Court declined "to presume general congressional awareness of the Commission's construction based only upon a few isolated statements in the thousands of pages of legislative documents." 436 U.S. at 121, 98 S.Ct. at 1713
 
 
 [21]
 In the context of a similar situation, the Supreme Court stated in Cannon that "(i)t is always appropriate to assume our elected officials, like other citizens, know the law"-referring to the prior judicial construction of a statute upon which the one under the Court's consideration had been patterned. 441 U.S. at 696, 99 S.Ct. at 1957-58 (dictum). This suggests that awareness of the prior judicial constructions recognizing an implied right of action under the CEA apparently may merely be ascribed to Congress. However, the wisdom of imputing to Congress the knowledge upon which we then, in turn, assume that legislation is predicated, seems dubious. See SEC v. Sloan, 436 U.S. at 118-24, 98 S.Ct. at 1712-14, and note 20 supra
 
 
 [22]
 The polarity between the analytical approaches and concepts of burden of persuasion employed by this court and the Second Circuit in Leist is epitomized by Judge Friendly's observation, respecting the passages of legislative history just examined, that "(i)t matters little whether this be called recognition or approval (of prior implied rights)." 638 F.2d at 309
 
 
 [23]
 Indeed, the passages in the H.R.Rep.975 as well as Representative Poage's remarks evince a disparagement of such actions, at least insofar as they had presented an impediment to effective exchange self-regulation-quite likely a factor in the exclusion of exchanges from the ranks of those suable by states under 7 U.S.C. § 13a-2 and those susceptible to the administrative reparations procedure of 7 U.S.C. § 18
 
 
 [24]
 Even though the proviso explicitly provides only that nothing "in this section " was meant to supersede extant court jurisdiction, the legislative history illustrates that Congress' intention was that nothing in the Act was to be taken to diminish that jurisdiction. S.Rep.No.1131, 93d Cong., 2d Sess. 23, reprinted in (1974) U.S.Code Cong. & Ad.News, pp. 5843, 5863; 120 Cong.Rec. 34737, 34997 (1974)
 
 
 [25]
 If we may indulge in so simplistic an observation: it is quite a different matter to remove the jurisdiction of courts over even a limited subject area like futures trading, than to eliminate a cause of action within that subject area. By the same token, a provision such as that in § 2, which explicitly directs the retention of jurisdiction, need not also denote the retention of an individual cause of action
 
 
 [26]
 Senator Clark testified that,
 "Often the most effective enforcement tool is a private suit where the plaintiff can recover three times his actual damages. The McGovern bill also authorizes them. Unfortunately, the House bill not only does not authorize them, but section 201 of the bill (now 7 U.S.C. § 2) may prohibit all court actions. The staff of the House Agriculture Committee has said that this was done inadvertently and they hope it can be corrected in the Senate."
 Senate Hearings supra, at 205.
 Professor Schotland, while addressing the proposed reparations procedure, observed more generally that "(i)f you do choose to retain (the reparations mechanism) ... there should be explicit language in the statute that federal and state courts are still open if a complainant prefers to go to trial there." Id. at 737, 746.
 
 
 [27]
 Some additional purported inferences of congressional awareness and approval of an implied cause of action have been noted by other courts. We find none of them persuasive. For example, both the Leist and Curran majorities presume, from various statements throughout the legislative history to the effect that the purpose of the CFTCA was "to strengthen" regulation, e. g., H.R.Rep.975, supra, at 53-54, that any existing enforcement mechanisms were meant to be maintained. Leist, 638 F.2d at 311-312, Curran v. Merrill Lynch, 622 F.2d at 232. It is just as reasonable to infer, however, that this "strengthening" of the extant regulatory structure was to be accomplished by the centralization in the federal government of a much-enlarged express enforcement structure, and that the "strengthening" need not include private actions-especially in light of the reparations procedure
 A second example is the reliance in Leist, 638 F.2d at 312-314, for instance, on the observation of Senator Talmadge that "(i)t is hoped that giving the Commission this (reparations) authority will somewhat lighten the burden upon the courts ...." 120 Cong.Rec. 30459 (1974). The argument raised from this is that if the reparations procedure had been intended fully to displace rather than supplement implied judicial actions, the Senator would have known rather than "hoped" that the burden on the courts would be significantly lightened. Aside from the fact that the Senator's statement concludes by noting, however, that the entire appeal and enforcement process remains in the courts, this particular statement was made with respect to a bill in which the right of appeal from a reparations proceeding lay initially to district court. H.R.13113, supra, § 106. Thus while one might hope for a reduction in judicial time commitments, there was little reason to expect a decreased docket of cases.
 
 
 [28]
 Each party seeks to embellish the basic analysis above, to some extent. Plaintiffs contend, supported by some district courts, that Congress' failure to enact these express provisions actually provides evidence that Congress recognized and approved the existing implied right and saw no need to supplement or expand it. See Navigator Group Funds, 487 F.Supp. at 423, quoting Smith v. Groover, 468 F.Supp. 113; Alken v. Lerner, 485 F.Supp. at 877. This is a very attenuated inference, however, and we join in the statement of the Supreme Court in T.I.M.E., Inc. v. United States, 359 U.S. 464, 478, 79 S.Ct. 904, 912, 3 L.Ed.2d 952 (1959): "we do not think that from the failure of Congress to grant a new authority any reliable inference can permissibly be drawn to the effect that any authority previously claimed was recognized and confirmed."
 Rosenthal, on the other hand points out that the reparations procedure that was eventually enacted first made its appearance in H.R.11955, immediately after the failure and withdrawal of the express judicial cause of action in H.R.11195. See Fischer v. Rosenthal & Co., 481 F.Supp. at 56. While this very well could be mere coincidence, one might infer from the chain of events that the reparations procedure was indeed viewed by Congress as displacing any judicial forum. The legislative history contains no express discussion elucidating any relationship between the two.
 
 
 [29]
 The Amtrak case was handed down during congressional deliberations on the CFTCA. However, the restrictive trend toward implied rights of action initiated there and carried forward with increasing intensity through later cases such as Barbour, Cort, and others up to TAMA and Touche Ross, could not have been evident to or anticipated by Congress at the time it enacted the CFTCA
 
 
 [30]
 While introducing the amendment raising from $2,500 to $5,000 the amount necessary to secure a full-fledged hearing in the reparations procedure, 7 U.S.C. § 18(b), Senator Huddleston discussed the backlog problem that the amendment was designed to help alleviate:
 "Compounding the undue stress placed on the reparation program, certain Federal district courts have taken the unfortunate position that Congress intended reparations to be the exclusive forum for adjudicating commodity customer claims. (citations omitted.) In order to alleviate the burden on the Commission's reparation program, the committee adopted an amendment that provides-for reparation complaints where the amount claimed as damages does not exceed $5,000-that a hearing be held only on the novel or basic issues that are determinative of the case. Thus, an aggrieved commodity customer will be able to obtain more expeditious treatment of his claim should the customer elect to pursue a claim in reparations rather than to proceed to arbitration or pursue in court the private right of action which has been judicially implied for violations of certain provisions of the Commodity Exchange Act, or which in the future courts may recognize for other provisions of the act."
 
 
 [124]
 Cong.Rec. 10537 (1978)
 Senator Leahy, in discussing the new provision expressly allowing states to pursue parens patriae actions for damages on behalf of their residents, observed:
 "The exemption from State suits provided to contract markets is justified due to the deterrent effect on contract markets caused by Commission regulation, institution of Commission enforcement proceedings, and the implied private rights of action that may be brought against those contract markets that fail to discharge their duties under the Commodity Exchange Act. In those actions brought by a State under this bill, a customer who makes an informed, voluntary election to have his State sue on his behalf to recover monetary damages for a particular violation would thereby extinguish that person's other alternatives for redress: arbitration reparations, or judicially implied private rights of civil action under the Act."
 
 
 [124]
 Cong.Rec. S.16527 (daily ed. Sept. 28, 1978)
 
 
 [31]
 It has been suggested that the passage of the express cause of action for states in § 13a-2 demonstrates that "when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly," Touche Ross, 442 U.S. at 571, 99 S.Ct. at 2487, and it obviously, therefore, did not intend to provide a cause of action for individuals under the CEA. See, e.g., Stone v. Saxon & Windsor Group Ltd., 485 F.Supp. at 1220-21. While we are not insensitive to the logic of this position, the legislative history of § 13a-2 indicates that a primary motivator in making explicit the right of states to sue may have been the need to overcome various common law prerequisites and restrictions on such parens patriae suits. See S.Rep.No. 850, supra, at 25. Accord, Leist v. Simplot, 638 F.2d at 319-320
 
 
 [32]
 In light of the reparations procedure it is not true, however, that such private actions are "necessary" to effectuate the purposes of the statute, as has sometimes been required. See United States v. Capelleti, 621 F.2d at 1317